## PENNY OUDHEUSDEN *v.* PETER OUDHEUSDEN
## (SC 20330)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

The defendant, whose marriage to the plaintiff had been dissolved, appealed
to the Appellate Court from the judgment of the trial court. The trial
court had awarded the plaintiff $18,000 per month in alimony that was
not modifiable in duration or amount. The trial court found that the
defendant's gross annual income of $550,000 was derived from two
closely held businesses that he owned, which were valued at $904,000.
As part of its financial orders, the court awarded 50 percent of the fair
market value of the two businesses to each party and ordered that the
defendant retain 100 percent ownership of both businesses. On appeal
to the Appellate Court, the defendant claimed, inter alia, that the trial
court impermissibly double counted his income by considering it both
for the purpose of valuing his businesses and in making its alimony
award. The Appellate Court reversed in part the trial court's judgment
and remanded the case for a new hearing on all financial issues. The
Appellate Court concluded that the trial court had abused its discretion

---

[7] The defendant argues that he was seized in violation of the fourth amend-
ment pursuant to *State* v. *Edmonds*, 323 Conn. 34, 145 A.3d 861 (2016), in
which this court determined that an unlawful seizure had taken place when,
inter alia, "two marked police cruisers converged on the defendant from
opposite directions, effectively blocking him from exiting the [parking] lot
. . . ." Id., 57. We reject the defendant's contention that this case is analo-
gous to *Edmonds*. In *Edmonds*, the defendant's initial encounter with law
enforcement originated as a result of an investigation into potential criminal
activity. See id., 40–41. No such suspicion of potential criminal activity
existed when Loud approached the defendant. We consider *Edmonds* inap-
posite.

Oudheusden *v.* Oudheusden

in failing to issue equitable orders and to consider, with respect to its alimony award, the possibility that the defendant, who was fifty-eight years old at the time of the dissolution and had a history of alcohol abuse, could become ill or might want to retire, or that his businesses could fail to thrive through no fault of his own. The Appellate Court further determined that the trial court had engaged in double counting. On the granting of certification, the plaintiff appealed to this court. *Held*:

1. The Appellate Court correctly concluded that the trial court had abused its discretion in awarding the plaintiff $18,000 per month in alimony that was not modifiable in duration or amount, as there was insufficient evidence that the award accounted for a substantial change in the defendant's circumstances: the trial court failed to consider or afford any significant weight to the defendant's age, health and future earning capacity, and, to the extent that it did consider these factors, the court could not reasonably have concluded that the defendant would continue to earn the same income for the rest of his life; moreover, although the evidence certainly supported the conclusion that the defendant's businesses would likely thrive for some time, the evidence did not support a finding that the growth of those businesses would necessarily be perpetual, and it was unreasonable for the trial court to conclude that the defendant would have the ability to comply with his alimony obligation for the rest of his life without some provision for modification should health or economics prevent compliance; accordingly, this court upheld the Appellate Court's reversal of the trial court's financial orders and its remand for a new hearing on all financial issues.

2. The trial court did not improperly engage in double counting, as the rule against double counting does not apply when the distributed asset is the value of a business and alimony is based on income earned from that business: this court relied on the decisions of courts in other jurisdictions in concluding that it is not double counting to award a spouse a lump sum representing a portion of the value of a business as well as alimony that is based on the paying spouse's actual income from that business; nevertheless, trial courts should consider all statutorily required factors and ensure that the awards as a whole are fair and equitable, and such consideration might include ensuring that the property distribution of a portion of a business' value to the nonowing spouse does not unfairly reduce the owning spouse's ability to earn income from that business.

Argued June 10, 2020—officially released April 27, 2021*

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial dis-

* April 27, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

338 Conn. 761　　　OCTOBER, 2021　　　763

Oudheusden *v.* Oudheusden

trict of Stamford-Norwalk and tried to the court, *Tindill, J.*; judgment dissolving the marriage and granting certain other relief, from which the defendant appealed to the Appellate Court, *Alvord, Keller* and *Eveleigh, Js.*, which reversed the judgment in part and remanded the case for further proceedings, and the plaintiff, on the granting of certification, appealed to this court. *Reversed in part*; *further proceedings*.

*Scott T. Garosshen*, with whom were *Kenneth J. Bartschi* and, on the brief, *Michael T. Meehan*, for the appellant (plaintiff).

*Yakov Pyetranker*, for the appellee (defendant).

*Opinion*

D'AURIA, J. The dispositive issue in this appeal is whether the Appellate Court correctly concluded that the trial court had abused its discretion in awarding the plaintiff, Penny Oudheusden, $18,000 per month in permanent, nonmodifiable alimony. On this issue, we agree with the Appellate Court and the defendant, Peter Oudheusden, that the award constituted an abuse of discretion, and we therefore affirm the Appellate Court's order of remand to the trial court for a hearing on new financial orders.

Also presented in this appeal is the question of whether the trial court, in its financial orders, equitably divided the marital estate or, instead, inappropriately engaged in "double counting" by awarding the plaintiff half of the value of the defendant's businesses among its orders dividing the marital property, while also awarding the plaintiff alimony on the basis of income generated by those businesses, which made up the defendant's sole sources of income. Because the issue of double counting is likely to reoccur on remand, and because we have not provided sufficient guidance concerning what constitutes double counting in contexts

Oudheusden *v.* Oudheusden

beyond those specifically implicated in our own case law, we reach this issue and agree with the plaintiff that this court's rule against double counting does not apply when, as in the present case, the asset at issue is the value of a business. Accordingly, we affirm in part and reverse in part the judgment of the Appellate Court.

The record reveals the following facts and procedural history. In its memorandum of decision, the trial court made several "key findings" of fact that the defendant does not challenge on appeal. The defendant was at fault for the irretrievable breakdown of the marriage in August, 2015. The defendant was the sole financial support of the plaintiff and their children beginning in 1988, and the plaintiff made significant, nonfinancial contributions to the family, including serving as the primary caretaker for the parties' children.

The defendant's gross annual income, which the court found to be $550,000, derives exclusively from his two closely held businesses. The defendant, "for the past thirty-two years, intentionally concealed the exact nature of the business[es] and marital finances from the plaintiff." The court found the defendant's testimony regarding the amount of his annual income, profit, cash flow, business expenses, and personal expenses not credible, and did not credit the testimony of his expert witness, who had testified as to the businesses' value. Instead, the court credited the testimony of the plaintiff and her expert witness, James R. Guberman, who determined that the combined fair market value of the defendant's two businesses was $904,000 ($512,000 for Connecticut Computer & Consulting Company, Inc., and $392,000 for WriteResult, LLC). Guberman used three different valuation methods and then applied a weighted average of those three methods to determine the fair market value of the businesses. Finally, the court found that the defendant's neglect of the marital home, located at 93 Cutler Road in Green-

Oudheusden *v.* Oudheusden

wich, and his failure to pay the mortgage beginning October 1, 2015, caused a loss of equity in the home of $162,339.89.

On the basis of these findings, the trial court found that a lifetime, periodic alimony award to the plaintiff was "appropriate and necessary." Specifically, the court stated: "The purpose of the court's alimony award is to provide a measure of financial security to the plaintiff, who has not worked outside of the marital home in nearly three decades, has $2095 in retirement funds, and has significantly less ability to acquire income or assets in the future than does the defendant. The plaintiff has limited earning potential. She is fifty-five years old, hearing impaired, and a cancer survivor. The plaintiff earned a bachelor's degree in international marketing . . . and a master's degree in teaching . . . . She is no longer licensed to teach." The trial court made no express findings as to the defendant's age (it is undisputed that he was fifty-eight years of age at the time of dissolution), health, or future earning potential.

In its financial orders, the trial court awarded the plaintiff periodic alimony in the amount of $18,000 per month "until the plaintiff's death, remarriage, cohabitation . . . or civil union, whichever shall occur first." The court made the alimony award "nonmodifiable as to duration and amount." In its property distribution, the trial court distributed the marital assets and debts as follows. The parties had three significant assets: the defendant's two businesses and the marital home. The trial court awarded 50 percent of the fair market value of the defendant's two businesses to each party, ordering the defendant to pay the plaintiff $452,000, representing her half of the businesses' value. The court awarded the defendant 100 percent ownership of both businesses. The court also awarded the defendant ownership of the marital home but awarded the plaintiff $221,677, an amount representing 100 percent of the

Oudheusden *v.* Oudheusden

estimated net equity in the house as it stood before the defendant's failure to maintain and pay the mortgage on the property caused a loss of equity of $162,339.89. The parties' remaining assets, which included personal property, pension and retirement accounts, bank accounts, and investment accounts, were awarded to whichever party listed the asset on his or her financial affidavit, with any joint accounts split equally.

The trial court ordered each party to be solely responsible for the debts and liabilities listed on their respective financial affidavits. It also ordered the defendant to maintain a ten year, term life insurance policy in the amount of $2 million, naming the plaintiff as the sole beneficiary. Finally, the trial court ordered the defendant to pay 100 percent of the plaintiff's legal, expert, and professional fees, totaling $223,298, either in a lump sum or by an agreed upon installment plan.[1]

The defendant appealed to the Appellate Court, claiming that the trial court's orders impermissibly double counted his income by considering it for business valuation purposes and also awarding alimony on the basis of his income from those businesses. The Appellate Court agreed with the defendant and reversed the judgment of the trial court as to its financial orders and remanded the case for a new hearing on all financial issues. See *Oudheusden* v. *Oudheusden*, 190 Conn. App. 169, 170, 209 A.3d 1282 (2019). The Appellate Court also agreed with the defendant that the trial court's financial orders constituted an abuse of discretion in other ways. See id., 182–85. The Appellate Court held that the trial court did not consider all of the statutory criteria and

---

[1] The defendant does not challenge the award of legal, expert, or professional fees to the plaintiff but does cite this award as evidence of his inability to comply with the trial court's other financial orders. The court also made the defendant responsible for any outstanding taxes for the years 1985 through 2015, as well as for any tax liability for 2016. The court did not expressly find the amount of the debts, liabilities, and taxes listed.

Oudheusden *v.* Oudheusden

all of the evidence when it fashioned its financial orders. Id., 182. In particular, the Appellate Court held that the trial court, in ordering nonmodifiable lifetime alimony, failed to consider the possibility that the defendant could become ill, that his businesses could fail to thrive through no fault of his own, or that, at some point in time, he might want to retire. Id., 183. The Appellate Court also disagreed with the trial court's determination that the plaintiff had limited earning potential and held that the record failed to support this determination. See id., 183–85.

The plaintiff petitioned for certification to appeal to this court, arguing, first, that the Appellate Court misapplied this court's double counting test by treating a lump sum payment that was based on an asset's value as equivalent to the transfer of an ownership interest in that asset. The plaintiff also claimed that the Appellate Court improperly substituted its judgment for that of the trial court in determining that the trial court abused its discretion in crafting its financial orders. Specifically, the plaintiff argued that the Appellate Court mischaracterized the trial court's findings of fact regarding her earning potential and that the Appellate Court could properly have concluded that the defendant would continue to earn sufficient income indefinitely. Finally, the plaintiff argued that it was within the trial court's broad discretion to award her lifetime, nonmodifiable alimony.

We granted the plaintiff's petition for certification, limited to the following issues: (1) "Did the Appellate Court correctly conclude that the trial court had erroneously engaged in 'double dipping' by awarding the plaintiff alimony from income generated by the defendant's businesses and also awarding the plaintiff a percentage of those businesses in its division of property?" And (2) "[d]id the Appellate Court correctly conclude that the trial court had abused its discretion by failing to

Oudheusden *v.* Oudheusden

enter financial orders that equitably divided the marital estate?'' *Oudheusden* v. *Oudheusden*, 332 Conn. 911, 912, 209 A.3d 1232 (2019). Additional facts will be set forth as required.

I

Because the second certified issue is dispositive of this appeal, we address it first, and, specifically, we address one aspect of that issue: whether the Appellate Court incorrectly held that the trial court's permanent, nonmodifiable alimony award constituted an abuse of discretion. On this record, we agree with the Appellate Court that the trial court abused its discretion.

In reviewing the alimony award at issue, we note that the scope of our review of a trial court's exercise of its broad discretion in marital dissolution cases is limited to whether the court correctly applied the law and reasonably could have concluded as it did. See, e.g., *Misthopoulos* v. *Misthopoulos*, 297 Conn. 358, 372, 999 A.2d 721 (2010); *Greco* v. *Greco*, 275 Conn. 348, 354, 880 A.2d 872 (2005); *Krafick* v. *Krafick*, 234 Conn. 783, 805, 663 A.2d 365 (1995). We make every reasonable presumption in favor of the correctness of the trial court's action. *Gabriel* v. *Gabriel*, 324 Conn. 324, 336, 152 A.3d 1230 (2016); *Krafick* v. *Krafick*, supra, 805. It is, however, well established that, in awarding alimony, the trial court must take into account all of the statutory factors enumerated in General Statutes § 46b-82 (a)[2]

[2] General Statutes § 46b-82 (a) provides in relevant part: ''In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall consider the evidence presented by each party and shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability and feasibility of such parent's securing employment.''

Oudheusden *v.* Oudheusden

and that its failure to do so constitutes an abuse of discretion. See *Greco* v. *Greco*, supra, 360 (trial courts must "consider all of the criteria enumerated in . . . § 46b-82"). The trial court does not need to give each factor equal weight or make express findings as to each factor, but it must consider each factor. Id., 355; see also *Burns* v. *Burns*, 41 Conn. App. 716, 726, 677 A.2d 971 (" 'Although a specific finding . . . is not required, the record must indicate the basis for the trial court's award.' . . . Sufficient evidence must exist to support the award, and the award may not stand if it is logically inconsistent with the facts found or the evidence." (Citation omitted.)), cert. denied, 239 Conn. 906, 682 A.2d 997 (1996); cf. *Simmons* v. *Simmons*, 244 Conn. 158, 180–81, 708 A.2d 949 (1998) (trial court abused its discretion in failing to consider defendant's age, which was "significant" omission in court's failure to award defendant any alimony). In addition, it is a "long settled principle that the defendant's ability to pay is a material consideration in formulating financial awards." *Greco* v. *Greco*, supra, 361. Finally, the trial court's financial orders must be consistent with the purpose of alimony: to provide continuing support for the nonpaying spouse, who is entitled to maintain the standard of living enjoyed during the marriage as closely as possible. *Hornung* v. *Hornung*, 323 Conn. 144, 162, 146 A.3d 912 (2016); id., 163 (plaintiff's efforts as homemaker, primary caretaker of parties' children increased defendant's earning capacity at expense of her own earning capacity, thus entitling her, postdissolution, to maintain standard of living parties enjoyed during marriage to extent possible); see *Blake* v. *Blake*, 211 Conn. 485, 498, 560 A.2d 396 (1989) ("periodic . . . alimony is based primarily upon a continuing duty to support"). When exercising its broad, equitable, remedial powers in domestic relations cases, a court "must examine both the public policy implicated and the basic elements of fairness." *Greco* v. *Greco*, supra, 363.

Oudheusden *v.* Oudheusden

In this case, the alimony award was both permanent and nonmodifiable. Permanent, or lifetime, alimony is alimony payable in regular installments and terminates upon the death of either spouse (and often upon the nonpaying spouse's remarriage or cohabitation).[3] See Black's Law Dictionary (11th Ed. 2019) p. 92 (defining "alimony"); cf. id. (defining "rehabilitative alimony," which is durational in nature). Permanent alimony is generally modifiable unless otherwise specified. See, e.g., *Eckert* v. *Eckert*, 285 Conn. 687, 693, 941 A.2d 301 (2008) ("[n]onmodification provisions that are clear and unambiguous . . . are enforceable"). General Statutes § 46b-86 (a) permits a court to make an alimony award that is not subject to modification. Id. An award may be nonmodifiable as to duration or amount, or both. See, e.g., *Way* v. *Way*, 60 Conn. App. 189, 197, 758 A.2d 884 (trial court improperly terminated award of household support pursuant to § 46b-86 (a) because award was nonmodifiable as to duration, amount), cert. denied, 255 Conn. 901, 762 A.2d 910 (2000). In this case, the trial court took the unusual step of awarding alimony that is both permanent and nonmodifiable as to duration and amount.

The trial court has the authority to order lifetime, or permanent (but modifiable), alimony awards. See General Statutes § 46b-86 (a) (authorizing permanent alimony awards and providing for modification upon substantial change in circumstances of either party); see also *Keenan* v. *Casillo*, 149 Conn. App. 642, 663–64 and n.7, 89 A.3d 912 (upholding permanent alimony award of $1200 per week to forty year old woman after three year marriage), cert. denied, 312 Conn. 910, 93

---

[3] The terms "permanent" and "lifetime" are somewhat imprecise given that it is common for permanent alimony awards to include limited termination provisions such as those we have described. Nonetheless, these awards are of indefinite duration unless they are terminated by a triggering event specified in the awards.

Oudheusden *v.* Oudheusden

A.3d 594 (2014). The defendant argues that, to incentiv-ize the eventual self-sufficiency of the supported spouse, courts have begun to disfavor permanent ali-mony and favor time limited (also called rehabilitative) alimony. Such a policy would not in any way limit the trial court's broad discretion to award permanent ali-mony when appropriate. See *Dan* v. *Dan*, 315 Conn. 1, 11, 105 A.3d 118 (2014) (The court explained in dictum that "courts have begun to limit the duration of alimony awards in order to encourage the receiving spouse to become self-sufficient. Underlying the concept of time limited alimony is the sound policy that such awards may provide an incentive for the spouse receiving sup-port to use diligence in procuring training or skills nec-essary to attain self-sufficiency." (Internal quotation marks omitted.)). Further, such a policy does not apply when, as in the present case, the trial court found that the supported spouse has limited earning potential due to her age, health, and the number of years she had been out of the workforce. Thus, we would not likely hold that the award of permanent alimony is an abuse of discretion under the facts of this case.

Although appellate level case law addressing a trial court's authority to make alimony awards nonmodifi-able is sparse, the legislature has indisputably conferred such authority. General Statutes § 46b-86 (a);[4] see also

_____

[4] General Statutes § 46b-86 (a) provides in relevant part: "Unless and to the extent that the decree precludes modification, any final order for the periodic payment of permanent alimony or support, an order for alimony or support pendente lite or an order requiring either party to maintain life insurance for the other party or a minor child of the parties may, at any time thereafter, be continued, set aside, altered or modified by the court upon a showing of a substantial change in the circumstances of either party . . . . By written agreement, stipulation or decision of the court, those items or circumstances that were contemplated and are not to be changed may be specified in the written agreement, stipulation or decision of the court. . . . If a court, after hearing, finds that a substantial change in circum-stances of either party has occurred, the court shall determine what modifica-tion of alimony, if any, is appropriate, considering the criteria set forth in section 46b-82."

Oudheusden *v.* Oudheusden

*Brown* v. *Brown*, 148 Conn. App. 13, 24–25, 84 A.3d 905,
cert. denied, 311 Conn. 933, 88 A.3d 549 (2014); *Marshall*
v. *Marshall*, 119 Conn. App. 120, 128–29, 988 A.2d 314,
cert. granted, 296 Conn. 908, 993 A.2d 467 (2010) (appeal
withdrawn November 18, 2010); *Sheehan* v. *Balasic*, 46
Conn. App. 327, 330–31, 699 A.2d 1036 (1997), appeal
dismissed, 245 Conn. 148, 710 A.2d 770 (1998); *Burns*
v. *Burns*, supra, 41 Conn. App. 724–25. As reflected in
the first sentence of § 46b-86 (a), the exercise of this
authority constitutes an exception to the general rule
of modifiability. General Statutes § 46b-86 (a) ("[*u*]*nless
and to the extent that the decree precludes modifica-
tion,* any final order for the periodic payment of perma-
nent alimony . . . may, at any time thereafter, be
continued, set aside, altered or modified by the court
upon a showing of a substantial change in the circum-
stances of either party . . . ." (emphasis added)). We
have in fact recognized that the language of § 46b-86
"suggests a legislative preference favoring the modifi-
ability of orders for periodic alimony." *Scoville* v. *Sco-
ville,* 179 Conn. 277, 279, 426 A.2d 271 (1979). Although
a clear and unambiguous nonmodification provision is
enforceable; *Eckert* v. *Eckert,* supra, 285 Conn. 693; we
have explained that, "because of the volatile nature of
. . . personal circumstances, it has been recognized
judicially that '[p]rovisions [that] preclude modification
of alimony [or support] tend to be disfavored.' " *Amodio*
v. *Amodio,* 247 Conn. 724, 730, 724 A.2d 1084 (1999);
see also *Cummock* v. *Cummock,* 180 Conn. 218, 222–23,
429 A.2d 474 (1980); *Lawler* v. *Lawler,* 16 Conn. App.
193, 203, 547 A.2d 89 (1988), appeal dismissed, 212
Conn. 117, 561 A.2d 128 (1989).

As an exception to the general rule, it is therefore
even more important that, before entering a nonmodifi-
able alimony order, the trial court consider the statutory
factors it is obliged to balance. And it requires no cita-
tion to state that consideration of all statutory factors—

Oudheusden *v.* Oudheusden

implicating "basic elements of fairness"—is more critical still when the trial court's alimony order is not only nonmodifiable, but also permanent.

In the present case, in addition to ordering the defendant to pay the plaintiff $452,000 (half the value of his businesses) and $221,677 (representing the equity in the marital home), to purchase a ten year, $2 million life insurance policy for the plaintiff's benefit, and to assume all of the debt in the marital home, the trial court ordered that the defendant pay the plaintiff $18,000 per month ($216,000 per year) in alimony. The court specifically made this lifetime award "nonmodifiable as to duration and amount": i.e., until one party dies, however long in the future that eventuality might occur. This provision of the award was clear and unambiguous. The parties do not argue otherwise. Although we make every reasonable presumption in favor of the correctness of the trial court's decision; *Krafick* v. *Krafick*, supra, 234 Conn. 805; we agree with the Appellate Court that a review of this alimony award in light of the record compels the conclusion that the trial court failed to consider all of the required statutory factors.

Specifically, on the basis of the evidence admitted at trial, we are obliged to conclude that the trial court either failed to consider the defendant's age, health, and future earning capacity, or failed to afford any significant weight to these factors. See *Hornung* v. *Hornung*, supra, 323 Conn. 164 ("The trial court must also look to the payor spouse's financial situation, in addition to that of the recipient spouse. Specifically, the trial court must consider the payor's age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, and employability." (Emphasis omitted.)). Although the trial court is not required to make express findings regarding every factor and need not give equal weight to each factor; *Greco* v. *Greco*, supra, 275 Conn. 355; notably, the trial

Oudheusden *v.* Oudheusden

court made express findings as to the plaintiff's age, health, and future earning potential without making parallel findings regarding the defendant.

The plaintiff contends that the trial court's orders reflect that the court in fact considered these factors but, in its discretion, did not find them compelling. She argues, for example, that there was no evidence of the defendant's declining health or any likely future health issues. But, although the defendant considers himself to be in good health, the record reflects that he was fifty-eight years of age at the time of trial and has a history of alcohol abuse. His age itself could suggest the likelihood of health issues at some point in the future, let alone his alcohol abuse. Because the defendant has no retirement savings and derives all of his income from his two closely held businesses, this evidence also relates to his future earning potential and, therefore, his ability to comply with the court's orders because his health is directly tied to his ability to sustain his current income.

To illustrate how the trial court's permanent, non-modifiable award could very well violate "basic elements of fairness" underpinning the statutory factors, we need only consider the not unlikely scenario in which both parties survive into their eighties. It requires no evidence to acknowledge that people can experience failing health as they advance into their later years. Yet, the trial court's award requires the defendant to continue to pay the plaintiff $216,000 per year even after twenty plus years of such payments and as both their health and ability to work dwindle.

The plaintiff argues that the trial court had before it enough evidence that the defendant's ability to earn income would not decrease over time, thereby supporting the alimony award. She notes that the defendant testified that he has no plans to retire and that his work

Oudheusden *v.* Oudheusden

requires no physical labor. The plaintiff also points to evidence that the defendant's businesses were projected to grow at a rate of 1.5 percent and that the defendant thought his businesses would grow after the divorce.[5] Although the evidence certainly supports a conclusion that the defendant's businesses are likely to thrive for some time, the evidence does not support a finding that the businesses' growth would necessarily be perpetual. To support the nonmodifiable, lifetime award in this case, and reflect a proper consideration of the defendant's future income and ability to comply with the alimony award; see *Greco* v. *Greco*, supra, 275 Conn. 361; the trial court must have concluded that the defendant's earnings will either remain static or continue to increase until his alimony obligation terminates due to the death of either party or the plaintiff's remarriage or cohabitation. Such a conclusion ignores, or certainly does not account for, "the volatile nature of . . . personal circumstances" that has led this court to disfavor " '[p]rovisions [that] preclude modification of alimony' "; *Amodio* v. *Amodio*, supra, 247 Conn. 730; and to conclude that the legislature has done the same. See *Scoville* v. *Scoville*, supra, 179 Conn. 279 (§ 46b-86 "suggests a legislative preference favoring the modifiability of orders for periodic alimony").

The trial court ordered the defendant to pay $216,000 to the plaintiff annually in alimony, come what may. It is clear from the record that the defendant's ability to comply with the court's orders is contingent on his continued ability to work. It was unreasonable for the trial court to conclude that the defendant will have the

[5] In support of this proposition, the plaintiff cites Guberman's valuation report and asserts, in a parenthetical in her brief, that the defendant's businesses have a projected growth rate of 1.5 percent. The valuation report does not explain how the growth rate was calculated, but, like many aspects of closely held businesses, future growth rates are speculative and unpredictable, and, therefore, the defendant's income from these businesses is speculative and unpredictable as well.

Oudheusden *v.* Oudheusden

ability to comply with this monthly alimony obligation for the rest of his life, however long that might be, without some provision for modification should health or economics prevent compliance. Thus, it is not clear from the record whether the trial court considered the defendant's age, health, or earning potential when it ordered lifetime alimony that was nonmodifiable as to duration and amount. To the extent that the court did consider these factors, it could not reasonably have concluded on this record that the defendant would continue to earn, at a minimum, the same income for the rest of his life.

It is of course *possible* he will have more than enough resources to comply with this order for his entire lifetime. As the Appellate Court held, however, it constitutes an abuse of discretion for the trial court to have failed to contemplate the realistic possibility of the defendant's illness, disability, or the loss of income through no fault of his own.[6] See *Oudheusden* v. *Oudheusden*, supra, 190 Conn. App. 183–85. Without either more detailed findings of fact or some indication in the orders themselves that the trial court considered these factors when fashioning the alimony award at issue, we conclude that the trial court either did not consider, or improperly considered, all of the statutory factors as required by § 46b-82 (a).

This is not to say that permanent, nonmodifiable alimony awards will always constitute an abuse of discre-

---

[6] The Appellate Court also held that the trial court's failure to consider the defendant's voluntary retirement in fashioning its financial orders constituted further evidence of an abuse of discretion. See *Oudheusden* v. *Oudheusden*, supra, 190 Conn. App. 183–85. Because we hold that the trial court abused its discretion by failing to consider, or that it improperly considered, the required statutory factors and the possibility that an *involuntary* decrease in earning capacity could affect the defendant's ability to comply with the financial orders for the rest of his life, we do not reach the issue of whether denying the defendant a voluntary retirement itself would render the alimony award an abuse of discretion.

Oudheusden *v.* Oudheusden

tion. Under some circumstances, such an award may be appropriate when there is evidence that the paying spouse can afford to pay the set amount, regardless of future earning capacity. For example, nonmodifiable, lifetime alimony might be appropriate when the paying spouse's income is guaranteed by a pension or when the paying spouse's income greatly exceeds the amount of the alimony award. But nonmodifiable, lifetime alimony awards are strong medicine. In fact, the parties have not cited, and we have not found in our own research, any case in which an appellate court has reviewed a lifetime periodic alimony award that was both (1) permanent and (2) nonmodifiable as to both duration and amount. This dearth of case law alone demonstrates the extraordinary nature of the trial court's approach.

We note that, in those cases in which a party has unsuccessfully challenged an alimony award that was either permanent (but modifiable) or nonmodifiable (but of limited duration), the trial court clearly accounted for the possibility that the paying spouse could have a substantial change in income in the future. See, e.g., *Brown* v. *Brown*, supra, 148 Conn. App. 23–24 (trial court placed caps on parties' annual gross incomes from employment, the attainment of which would not be considered substantial change in circumstances that would permit modification of nine year alimony award of between $2000 and $2500 per week). Two of these cases specifically anticipate the paying spouse's voluntary retirement. See *Marshall* v. *Marshall*, supra, 119 Conn. App. 124 (defendant's periodic alimony payments would be reduced to $1 per year upon his retirement); *Burns* v. *Burns*, supra, 41 Conn. App. 719 (alimony award of $5666.67 per month could not be terminated but was modifiable upon defendant's retirement on basis of change in circumstances).

Oudheusden *v.* Oudheusden

Here, by contrast, there is insufficient evidence that the trial court's orders account for the possibility of a substantial change in the defendant's circumstances. For this reason, the trial court's award of $18,000 per month in periodic alimony, permanent and nonmodifiable as to duration and amount, was an abuse of discretion. Because our holding disturbs the trial court's carefully crafted mosaic of financial orders; see, e.g., *Greco* v. *Greco*, supra, 275 Conn. 354; we must uphold the Appellate Court's reversal of the trial court's financial orders and remand of this case for a new hearing on all financial issues.[7]

II

Having upheld the Appellate Court's conclusion that the trial court's alimony award constituted an abuse of discretion, we agree with the Appellate Court that the case must be remanded to the trial court for a new hearing on all financial issues. We nevertheless address the plaintiff's remaining claim as to which we also granted certification to appeal because the issue of double counting is almost certain to arise on remand. See, e.g., *State* v. *Chyung*, 325 Conn. 236, 260 n.21, 157 A.3d 628 (2017) (reviewing court may resolve claims that are not necessary for resolution of appeal but are likely to arise during proceedings on remand).

The following additional facts are required for the disposition of this issue. The trial court credited the testimony of the plaintiff's expert, Guberman, regarding the fair market value of the defendant's two businesses. The plaintiff's expert valued the businesses using a weighted average of three valuation methods—the excess earn-

---

[7] Because we hold that the trial court improperly failed to consider or properly apply the factors in § 46b-82 pertaining to the defendant and his ability to comply with the financial orders, we do not reach the plaintiff's argument that the Appellate Court incorrectly reweighed the evidence or mischaracterized the trial court's findings as to his earning capacity.

Oudheusden *v.* Oudheusden

ings method, the capitalization of income method, and the market approach. The excess earnings and capitalization of income methods—collectively referred to as "income methods" or "income approaches"—use the businesses' incomes to determine their fair market value.

A brief description of the two income methods of valuation used by the plaintiff's expert is necessary. In his capitalization of income valuation, Guberman used a multiyear weighted average of the businesses' adjusted pretax income to determine reasonable future cash flow. The adjustments made included subtractions for the "cash flows paid to or for the benefit of" the defendant. The adjustments also accounted for the "reasonable compensation payable to [the defendant] for the part-time services he provides to the company." In his excess earnings valuation, which calculates fair market value partly by considering the businesses' goodwill, Guberman found that goodwill accounts for 81 percent of the overall value of Connecticut Computer & Consulting Company, Inc., and 49 percent of the value of WriteResult, LLC. In arriving at a value for the businesses, Guberman weighted both of these two income methods at 40 percent, and weighted the market approach at 20 percent. He concluded that the combined fair market value of the defendant's business entities was $904,000 ($512,000 for Connecticut Computer & Consulting Company, Inc.; $392,000 for WriteResult, LLC). In its property distribution order, the trial court awarded the plaintiff 50 percent of this fair market value, or a $452,000 lump sum.

As discussed in part I of this opinion, the trial court's financial orders also awarded the plaintiff permanent, nonmodifiable periodic alimony in the amount of $18,000 per month, or $216,000 annually. The trial court did not explain how it came to this number but presumably it considered the appropriate statutory factors,

Oudheusden *v.* Oudheusden

including the defendant's gross annual income, which the trial court found to be $550,000. See General Statutes § 46b-82 (a) (listing factors trial court must consider in awarding alimony). The trial court also did not explain how it determined the defendant's income.[8] The defendant requested an articulation as to whether the trial's court's finding of his gross annual income constituted actual income earned from the two businesses or his earning capacity. In response, the court clarified that it based the defendant's gross annual income on the actual income from the defendant's two businesses: it did not make a finding of earning capacity. Additionally, the trial court did not explain how the defendant's gross annual income factored into its determination of alimony, but the defendant did not request a further articulation.

We are asked to decide whether the trial court double counted by awarding the plaintiff alimony from income generated by the defendant's businesses and also awarding the plaintiff 50 percent of the fair market value of those businesses. The Appellate Court held, and the defendant maintains, that double counting is generally prohibited and occurs when a court "take[s] an income producing asset into account in its property division and also award[s] alimony based on that same income.'' *Oudheusden* v. *Oudheusden*, supra, 190 Conn. App. 178.

---

[8] It appears from the record that the trial court based the defendant's gross annual income on an opinion contained in Guberman's report. Guberman suggested in the report that, because the defendant has sole control of the earnings and cash flows of both businesses, the trial court should include in the defendant's actual income all of his actual compensation (between $323,369 and $394,319) as well as the net earnings retained by the businesses at year end, which Guberman calculated to total $540,000 annually (including the defendant's actual compensation). Therefore, it appears that the trial court included discretionary cash flow in the income determination, but it is unclear exactly how the trial court arrived at the slightly higher figure of $550,000. Once again, though, the defendant does not challenge any factual finding.

338 Conn. 761 OCTOBER, 2021 781

Oudheusden *v.* Oudheusden

The defendant contends that the Appellate Court properly considered it double counting to award the plaintiff half the value of the businesses when the trial court valued the businesses, in part, on the basis of the companies' future earnings, including the defendant's income, which it also considered in calculating the alimony award. The plaintiff argues that double counting did not occur here, because, according to our case law, double counting can occur only when a party is ordered to pay alimony from an income stream he or she no longer has because it was distributed in the division of property orders, not when, as here, the trial court distributes a portion of the *value* of the businesses to the plaintiff while the defendant retains 100 percent ownership of those businesses. Because the defendant retains full ownership of the businesses, the plaintiff argues, he still has an income stream from which to make the alimony payments that is separate and distinct from the payment made to the plaintiff in the property distribution. We conclude that the trial court did not improperly double count the value of the defendant's businesses in the present case because any rule against double counting does not apply when the distributed asset is the value of a business and the alimony is based on income earned from that business.

A

"Courts and commentators have often disagreed . . . as to what constitutes [double counting], whether [double counting] ought to be prohibited as a matter of law, and if not so prohibited, whether it is inequitable in the circumstances of the particular divorce settlement." *Sampson* v. *Sampson*, 62 Mass. App. 366, 374, 816 N.E.2d 999, review denied, 443 Mass. 1102, 820 N.E.2d 259 (2004). "Double counting" or "double dipping" are not statutory terms: there is no legislative admonition against double counting in Connecticut, and we therefore have no direct legislative guidance on the issue. The

Oudheusden *v.* Oudheusden

concept instead is ultimately an equitable one. "Double [counting] is a term used to describe the supposed unfairness that results when property is awarded to a spouse in equitable distribution but is also treated as a source of income for purposes of calculating maintenance or alimony." (Internal quotation marks omitted.) " 'Double Dipping,' " 14 Equitable Distribution J., no. 5, May, 1997, p. 49 (Double Dipping).

Concern about double counting arose in the context of pensions and retirement benefits, because, "in the case of pensions or other retirement assets, the asset *is* the income that will eventually be distributed." (Emphasis in original.) L. Morgan, " 'Double Dipping': A Good Theory Gone Bad," 25 J. Am. Acad. Matrim. L. 133, 140–41 (2012). Proponents of a general prohibition against double counting argue that it allows the alimony recipient to dip twice into the same asset. Double Dipping, supra, p. 49. Those who take the opposite view point to the different purposes of property distribution and spousal support argue that a strict prohibition on double counting may prevent the awards from fulfilling their distinct statutory purposes. See id.; see also *Mickey* v. *Mickey*, 292 Conn. 597, 615, 974 A.2d 641 (2009) ("[d]espite their close relationship . . . the purposes and operation of [General Statutes] §§ 46b-81 and 46b-82 are distinct and, to an extent, complementary, applying under different circumstances for different reasons"). "[T]he purpose of postdissolution property division is to unscramble the ownership of property" of each spouse; (internal quotation marks omitted) id., 614; whereas the purpose of alimony "is to recognize the obligation of support that spouses assume toward each other by virtue of the marriage." (Internal quotation marks omitted.) Id., 615–16.

This court has recognized that it is not double counting for the trial court to *consider* the same asset in both the property distribution and, as allocated, for purposes of determining spousal support. See *Krafick* v. *Krafick*,

Oudheusden *v.* Oudheusden

supra, 234 Conn. 804–805 n.26.[9] Contra N.J. Stat. Ann.
§ 2A:34-23 (b) (14) (West Supp. 2020) (''[w]hen a share
of a retirement benefit is treated as an asset for pur-
poses of equitable distribution, the court shall not con-
sider income generated thereafter by that share for
purposes of determining alimony''). However, this court
has suggested that it would be double counting for
income from property that was awarded to the nonpay-
ing spouse—and is therefore no longer available to the
paying spouse—to be awarded to the nonpaying spouse
in the alimony award. Although this court has never so
held, our case law strongly suggests that we would
prohibit this type of double counting in the pension
context. See *Krafick* v. *Krafick*, supra, 804–805 n.26.
Notably, this court never has been asked to determine
if this double counting rule would apply when the asset
at issue is the value of a business, as in the present case.

A brief discussion of double counting and our own
case law on the issue illustrates the need for this court
to provide additional guidance, specific to businesses.

B

In *Krafick* v. *Krafick*, supra, 234 Conn. 783, this court
implicitly rejected a general prohibition on double
counting when it held that the trial court improperly
assigned the defendant's pension no value in the prop-
erty distribution, even though the trial court acknowl-
edged that the pension was an asset of the marriage. Id.,
805–806. The court in *Krafick* rebuffed the ''defendant's
contention that to consider vested [pension] benefits
for purposes of equitable distribution and also, *as allo-
cated*, as a source of alimony constitutes impermissible
'double [counting].' '' (Emphasis added.) Id., 804–805
n.26. The court went on to explain that ''[o]ur alimony

[9] Courts in other jurisdictions that have considered the issue have declined
to extend the prohibition to situations in which the asset at issue is the
value of a business. See Double Dipping, supra, p. 54.

Oudheusden *v.* Oudheusden

statute expressly provides that '[i]n determining whether alimony shall be awarded, and the duration and amount of the award, the court . . . shall consider . . . the award, if any, which the court may make pursuant to [§] 46b-81 [in distributing property].' . . . Relying on the pension benefits allocated to the employee spouse under § 46b-81 as a source of alimony would be improper only to the extent that any portion of the pension assigned to the nonemployee spouse [in the distribution of property] was counted in determining the employee spouse's resources for purposes of alimony." (Citation omitted.) Id., 805 n.26. Thus, this court has suggested that it would recognize a more limited prohibition on double counting in the pension context, but there was no double counting in *Krafick*.

This court also has considered the application of the double counting rule in the context of bank accounts, investment accounts, vested stock, stock options, and stock in a closely held business. For example, in *Greco*, we reviewed the trial court's order requiring the defendant to transfer the entirety of his stock in a business, or the value of that stock, to the plaintiff and also awarding the plaintiff alimony that was based in part on the salary the defendant earned as an employee of the same business. *Greco* v. *Greco*, supra, 275 Conn. 352, 361. Although we did not analyze why the rule against double counting should extend to the awarding of stock, we concluded that no double counting occurred because, notwithstanding that "the defendant's salary from [the business] appear[ed] to have been his main source of income . . . the stock itself did not constitute a significant resource or source of income and the trial court did not attribute any such income [e.g., cash dividends] to the defendant in determining his income for the purpose of calculating alimony." (Citation omitted.) Id., 357 n.8.[10]

---

[10] The defendant relies on *Greco*, arguing that, "[i]n this case, the trial court obviously made that *Greco* attribution by linking the defendant's income to

Oudheusden *v.* Oudheusden

Similarly, in *O'Brien* v. *O'Brien*, 326 Conn. 81, 161 A.3d 1236 (2017), the assets at issue included bank and investment accounts, as well as vested stock and stock options in the company at which the plaintiff was employed but was not an owner. Id., 86–87. The court explained the general rule against double counting as follows: "A trial court's alimony award constitutes impermissible double [counting] only if the court considers, as a source of the alimony payments, assets distributed to the party *receiving* the alimony. . . . [I]f a trial court assigns a certain asset—a bank account, for example—to the party *receiving* alimony, it cannot consider that same bank account as a source of future alimony payments because the account has not been distributed to the party *paying* the alimony." (Citations omitted; emphasis in original.) Id., 120–21. Once again, though, we determined that there was no double counting because the assets the plaintiff would use to pay the alimony award were all awarded to the plaintiff himself. Id.[11]

---

the businesses in its clarification order." Although the facts here might appear to satisfy the test for double counting laid out in *Greco* (i.e., the businesses themselves *did* constitute a significant resource or source of income), this case is distinguishable because, as we will discuss more fully, the value of a business asset is not the same as stock.

[11] The Appellate Court has found double counting on only one occasion. In *Lynch* v. *Lynch*, 135 Conn. App. 40, 43 A.3d 667 (2012), the plaintiff had published a book. Id., 43. The Appellate Court held that the trial court double counted by awarding the defendant 30 percent of the value of the plaintiff's unsold books as well as 30 percent of all income the plaintiff would receive in the future from the sale of the same books. Id., 43–44, 53–54. Both of these awards were part of the court's property distribution under § 46b-81. Id., 52. In the present case, by contrast, the defendant does not claim that the same asset was distributed twice under § 46b-81. Rather, the question presented in this case—whether the same income was counted both for alimony and property distribution purposes—is clearly distinguishable.

The Appellate Court has considered and rejected double counting arguments on three other occasions. In *Callahan* v. *Callahan*, 157 Conn. App. 78, 116 A.3d 317, cert. denied, 317 Conn. 913, 116 A.3d 812 (2015), and cert. denied, 317 Conn. 914, 116 A.3d 813 (2015), and *McRae* v. *McRae*, 129 Conn. App. 171, 20 A.3d 1255 (2011), the Appellate Court held that double counting had not occurred when the alimony award was based on the paying spouse's

Oudheusden *v.* Oudheusden

C

As noted, this court never has been asked to determine whether the rule against double counting applies when the value of a business is distributed, as in the present case. In concluding that the trial court engaged in double counting in this case, the Appellate Court cited one if its own cases for the "general principle . . . that a court may not take an income producing asset into account in its property division and also award alimony based on that same income." *Oudheusden* v. *Oudheusden*, supra, 190 Conn. App. 178, citing *Callahan* v. *Callahan*, 157 Conn. App. 78, 95, 116 A.3d 317, cert. denied, 317 Conn. 913, 116 A.3d 812 (2015), and cert. denied, 317 Conn. 914, 116 A.3d 813 (2015). The Appellate Court's statement of this "general principle" sweeps too far, however, and, in some contexts, is at odds with this court's holding in *Krafick* and with the text of §§ 46b-81 and 46b-82.

For the proposition quoted previously, the Appellate Court relied on dictum from its own precedent in *Callahan.* The language in *Callahan* is dictum because the parties in that case agreed to the application of this general principle and because the principle ultimately did not apply—the court in *Callahan* determined that the alimony award in that case was based on the defendant's earning capacity, not his actual income from the business. *Callahan* v. *Callahan*, supra, 157 Conn. App. 95–97. In addition, the court in *Callahan* derived this "general principle" from *Eslami* v. *Eslami*, 218 Conn. 801, 815, 591 A.2d 411 (1991), a decision that predates *Krafick*. See *Callahan* v. *Callahan*, supra, 95–97. In

earning capacity. *Callahan* v. *Callahan*, supra, 97; *McRae* v. *McRae*, supra 188. And, in *Utz* v. *Utz*, 112 Conn. App. 631, 963 A.2d 1049, cert. denied, 291 Conn. 908, 969 A.2d 173 (2009), the Appellate Court rejected a double counting argument when—unlike in the present case—no portion of the paying spouse's business or its value was transferred to the payee spouse. Id., 639–40.

Oudheusden *v.* Oudheusden

*Eslami*, this court said, in dictum, that "[a] valuation method that does not differentiate between the goodwill of the practice as a saleable entity and the practitioner's own earning power as enhanced by such goodwill may well result in counting the same basis for a financial award in dissolution cases twice, once as an asset of his estate subject to allocation and again, as a component of his *earning capacity* forming the basis for alimony." (Emphasis added.) *Eslami* v. *Eslami*, supra, 815. Because the court in *Eslami* was not required to determine whether the double counting rule applied to the value of businesses, this statement was made without considering the unique characteristics of businesses. In addition, the dictum from *Eslami* does not apply to the present case because, here, the trial court made no finding of fact as to the defendant's earning capacity and the defendant did not request articulation as to how the trial court determined his earning capacity. Therefore, we are not persuaded that the dictum in *Eslami* supports extending the rule to the valuation of businesses. It is clear from this overview of Connecticut's double counting jurisprudence that the rule is not well developed and never has been applied to the business context at issue here.

Because this court never has clearly extended our case law regarding double counting to the valuation of businesses, we look to case law from other jurisdictions for guidance on how this rule applies to businesses. The defendant argues that double counting is implicated because the businesses were valued using a method that was based on income for property distribution purposes and the alimony award was based on the income from those businesses.[12] Yet, every jurisdiction

---

[12] To the extent that the businesses were valued using the market approach, double counting is not implicated because it does not use income to calculate fair market value. See L. Morgan, supra, 25 J. Am. Acad. Matrim. L. 145 ("no one would argue that valuing a business using the market approach results in double [counting]").

Oudheusden *v.* Oudheusden

that has considered the issue has concluded that the double counting rule does not apply when the asset at issue is the value of a business, even when the business' fair market value was determined by an income method of valuation. See *Steneken* v. *Steneken*, 183 N.J. 290, 301–302, 873 A.2d 501 (2005) ("We find no inequity in the use of the individually fair results obtained due to the use of an asset valuation methodology normalizing salary in an [ongoing] close corporation for equitable distribution purposes, and the use of actual salary received in the calculus of alimony. The interplay of those two calculations does not constitute 'double counting.' "); *Keane* v. *Keane*, 8 N.Y.3d 115, 121, 861 N.E.2d 98, 828 N.Y.S.2d 283 (2006) ("We do not see why an inquiry as to double counting should depend on the valuation method used. After all, any valuation of an [income producing] property will necessarily take into account the [income producing] capacity of that property. To prevent any income derived from any [income producing] property from being 'double counted' would, therefore, significantly limit the trial court's considerable discretion in equitably distributing marital property and awarding maintenance."); *McReath* v. *McReath*, 335 Wis. 2d 643, 674–76, 800 N.W.2d 399 (2011) ("when determining maintenance . . . counting income from income earning assets [assigned to a spouse in property division] will typically not implicate double counting" (citations omitted; footnotes omitted)). These jurisdictions treat the income approach to valuation as simply a tool to determine a business' fair market value, just like the market approach and the asset approach.

In a case with strong similarities to the present appeal, the New Jersey Supreme Court explained the rationale behind this rule particularly well. In *Steneken*, the asset was a closely held business of which the defendant was the sole shareholder. *Steneken* v. *Stene-*

Oudheusden *v.* Oudheusden

*ken*, supra, 183 N.J. 293–94. The defendant's expert in
*Steneken* used the capitalization of earnings method to
value the business. Id., 298. The trial court, in its prop-
erty distribution, awarded 35 percent of this value to
the plaintiff. *Steneken* v. *Steneken*, 367 N.J. Super. 427,
432, 843 A.2d 344 (App. Div. 2004), aff'd as modified,
183 N.J. 290, 873 A.2d 501 (2005). As in the present
case, the defendant was awarded sole ownership of the
business—i.e., the court did not order that the parties
would own the business jointly. Id. The plaintiff also
was awarded alimony that was based on the defendant's
actual income from the business. Id. The defendant
argued that it was double counting to use his actual
income to calculate the alimony award because his
excess earnings beyond his normalized income were
also considered in valuing the business, of which the
plaintiff received a share. *Steneken* v. *Steneken*, supra,
183 N.J. 294–95; *Steneken* v. *Steneken*, supra, 367 N.J.
Super. 433.

The New Jersey Supreme Court disagreed. "Principles
of fairness that properly account for the dichotomy
between alimony, on the one hand, and equitable distri-
bution, on the other, are what inform our analysis."
*Steneken* v. *Steneken*, supra, 183 N.J. 300. "Because
we embrace the premise that alimony and equitable
distribution calculations, albeit interrelated, are sepa-
rate, distinct, and not entirely compatible financial exer-
cises, and because asset valuation methodologies
applied in the equitable distribution setting are not con-
gruent with the factors relevant to alimony considera-
tions, we conclude that the circumstances here present
a fair and proper method of both awarding alimony and
determining equitable distribution." Id., 301. "Where,
as here, the major marital asset is a [closely held] corpo-
ration and the supporting spouse has determined what
his or her income was during the marriage, the sup-
ported spouse is entitled, [postdivorce], both to alimony

Oudheusden *v.* Oudheusden

sufficient to maintain a reasonably comparable lifestyle and to a fair division of the asset. We do not agree with [the] defendant's view that this analysis effects a 'windfall' to the supported spouse. Trial courts remain free to consider, in the exercise of their discretion and in accordance with the statutory guidelines, the fair and proper quantum of alimony and equitable distribution attendant to each case before them.'' (Footnote omitted.) Id., 303–304.

In addition, the New Jersey Supreme Court pointed out a logical flaw at the core of the argument that it is improper double counting to use an income method of valuation on the property distribution side and actual income on the alimony side of the equation. ''[T]he [d]efendant mistakenly equates the statutory and decisional methodology applied in the calculation of alimony with a valuation methodology applied for equitable distribution purposes that requires that revenues and expenses, including salaries, be normalized so as to present a fair valuation of a going concern. . . . [T]he proper issue is whether, under the circumstances, the alimony awarded and the equitable distribution made are, both singly and together, fair and consistent with the statutory design.'' Id., 301.

D

We are persuaded by our sister courts that have addressed the issue and concluded that it is not double counting for a trial court to award a spouse a lump sum representing a portion of the value of a business and also award the spouse alimony that is based on the paying spouse's actual income from that business. In the present case, that is precisely what happened. Therefore, we conclude that it was not improper for the trial court to base the property distribution on Guberman's valuation of the defendant's businesses while also considering the defendant's income from those businesses in its alimony award.

338 Conn. 761 OCTOBER, 2021 791

Oudheusden *v.* Oudheusden

Nevertheless, trial courts should—consistent with our statutory scheme—consider all required statutory factors and ensure that each award is consistent with its respective statutory purpose and that the awards as a whole are fair and equitable. This consideration might include ensuring that the property distribution of a portion of a business' value to the nonowning spouse does not unfairly reduce the paying spouse's ability to earn income from that business (resulting in the undercapitalization of the business, for example). As with any alimony or property distribution award, reviewing courts may consider how a business has been awarded (i.e., divided) in determining whether the alimony and distribution awards serve their statutory purposes and whether the award as a whole is fair. See *Greco* v. *Greco*, supra, 275 Conn. 354–56, 362–63 (discussing appellate review of trial court's financial orders); see also *Steneken* v. *Steneken*, 183 N.J. 302 (second and final step in inquiry is whether result as whole is "fair under the circumstances and congruent with the standards set forth in [the alimony statute] and [the equitable distribution statute]"); *McReath* v. *McReath*, supra, 335 Wis. 2d 677 ("the focus should be on fairness, not rigid [double counting] rules"). In the present case, because we already have determined that the trial court's alimony award was an abuse of discretion, we need not undertake consideration of whether the award as a whole is fair. The trial court will have to conduct a new hearing on financial issues and, among other things, will be guided by the principles outlined in this opinion.

The judgment of the Appellate Court is affirmed with respect to its determination regarding the trial court's financial orders, the judgment of the Appellate Court is reversed with respect to its determination that the trial court improperly double counted the value of the defendant's businesses for purposes of the property division and alimony awards, and the case is remanded

to the Appellate Court with direction to remand the case to the trial court for a new hearing on all financial issues.

In this opinion the other justices concurred.

———————————————